CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

OCT 0 9 2008

JOHN F CORCORAN, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

LAWRENCE W. LOWERY,  )  Case No. 5:07cv00091
   )
      *Plaintiff,*  )  **REPORT AND**
v.  )  **RECOMMENDATION**
   )
MICHAEL J. ASTRUE,  )  By:   Hon. James G. Welsh
Commissioner of Social Security,  )        U. S. Magistrate Judge
   )
      *Defendant,*  )
   )

The plaintiff, Lawrence W. Lowery, brings this action pursuant to 42 U.S.C. §§ 405 (g) and

1383(c)(3) challenging the final decision of the Commissioner of the Social Security Administration

("the agency") denying his claims for disability insurance benefits and for supplemental security

income under Titles II and XVI of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§

416(I) and 423, and 42 U.S.C. §§ 1381 *et seq.*, respectively. Jurisdiction of the court is pursuant to

42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).


The Commissioner's Answer was filed on January 2, 2008, along with a certified copy of the

administrative record ("R.") containing the evidentiary basis for the findings and conclusions set

forth in the Commissioner's final decision. By order of referral entered the following day, this case

is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B).

The plaintiff's memorandum of points and authorities was filed on February 15, 2008. His basic contentions on appeal are that the Commissioner's final decision was based on a flawed assessment of the medical record due to the explicit refusal by the Administrative Law Judge ("ALJ") to give any decisional weight to the medical findings and conclusions of the consultive medical examiner or to the subsequent functional assessment by a state agency consultant. In response, the Commissioner argues that "substantial evidence" supports the denial and that "nothing" in the "objective" consulting examination "would have prevented the ALJ from reaching a conclusion adverse to the plaintiff." Both parties have moved for summary judgment and no written request was made for oral argument. [1]

Based on a thorough review of the administrative record and for the reasons herein set forth, it is recommended that the plaintiff's motion for summary judgment be granted, the Commissioner's motion be denied, and the case be remanded solely for the purpose of calculating and paying benefits consistent with this report and recommendation.

## I.    Standard of Review

The court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to a period of disability insurance benefits or supplemental security income. "Under

---

[1] Paragraph 2 of the court's Standing Order No. 2005-2 requires that the plaintiff in a Social Security case must request oral argument in writing at the time his or her brief is filed.

2

the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3$^d$ 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

## II.    Administrative History

Alleging a July 30, 2003 disability onset date (R.13,61,200), the record shows that the plaintiff protectively filed his current applications seeking a period of disability insurance benefits and supplemental security income on or about December 7, 2004. (R.13,60,200-201.) In connection with these applications, the plaintiff stated that he was unable to work due to "allergic reactions" [causing] swelling of the face, mouth, tongue and hands, . . . Bell's palsy, high blood pressure, and borderline diabetes (type 2)." (R.71.) After his applications were denied initially, the plaintiff filed a timely request for reconsideration on March 2, 2005. (R.1,21,23-28,33-34.)  In connection therewith, his attorney noted that the plaintiff also had "significant and severe impairments of his

3

hands, low back and knees" and he requested that the plaintiff be scheduled for a consultive examination. (R.35-36.) Based primarily on the results of this agency-arranged examination, the plaintiff was found on reconsideration to be disabled and was awarded benefits as of February 1, 2005, but not before that date. (R.22,37-38.) Contending that benefits should have been awarded based on an earlier onset date, the plaintiff requested a hearing, which was held on June 27, 2006 before an ALJ. (R.13,39-50,56-57,212,219-247.) The plaintiff was present, testified, and was represented by counsel. (R.13,54,212,219-247.) The plaintiff's wife testified in support of her husband's applications (R.248-251), and Bonnie Martindale, testified as a vocational witness. (R.50-52,212,251-258.)

Utilizing the agency's sequential decision-making process, the ALJ concluded that the plaintiff was insured through December 31, 2008 and that his work subsequent to his alleged disability onset date represented an unsuccessful work attempt. (R.15-16.) *See* 20 C.F.R. § 404.1576 and 20 C.F.R. § 416.976. He next concluded that the plaintiff's degenerative disc disease, degenerative joint disease of both knees and arthritis were the plaintiff's only "severe" impairments, but neither individually nor in combination did they meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1. (R.16-17.) *See*, 20 C.F.R. §§ 404.1520(d) and 404.1571 *et seq*; 20 C.F.R. §§ 416.920(b), and 416.971 *et seq*. The ALJ then concluded that the plaintiff retained the residual functional capacity to perform work at a medium exertional level. [2] (R.17-20.)

---

[2] "Medium work" involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing as much as twenty-five pounds. 20 C.F.R. §§ 404.1567(c) and 416.967(c).

4

After the ALJ's issuance of his adverse written decision, the plaintiff requested administrative review. (R.9, 207-211.) His request was denied (R.5-8), and the ALJ's decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

## III. Facts

The plaintiff was born in 1944 and was sixty-two years of age [3] at the time the ALJ's written decision was issued. (R.61,200.) He attended school through the ninth grade; his ability to read and write is limited, and his past relevant work included driving heavy construction equipment and off-road trucks. (R.72-78,100-107,108-113,220-228,353-255.) This work was described by the vocational witness as medium in exertional level and with skills specific to the occupation. (R.253-254.) This work could not be done at a light exertional level (R255-256), and if limited to light work, at age fifty-five or older the plaintiff would be deemed to be disabled pursuant to the applicable "Grid" rule. [4] (R.257-258.)

In addition to seeking treatment for several minor transient medical problems between March 4, 2001 and the end of July 2003, the office records of Stuarts Draft Family Practice (Drs. Dennis Hatter and Richard Miller) show that the plaintiff was monitored on an ongoing basis for hypertension and diabetes (diet controlled). (R.126-130,141,138-156.) At the time of his July 23

---

[3] The agency considers the age of a person 55 years of age or older to affect significantly his or her ability to adjust to other work. 20 C.F.R. §§ 404.1563(d) and 404.1568(d)(4); 20 C.F.R. §§ 416.963(d) and 416.968(d)(4).

[4] By application of Rule 202,02, a person of advanced age, with a limited education, with no transferable skills and with a work capacity limited to light work is deemed to be disabled. 20 C.F.R. Part 404, Subpart P, Appx. 2 § 202.02.

5

2003 physical the plaintiff weighed 296 pounds; his height was 6' 4", and his hypertension and diabetes were deemed to be controlled. (R.127-129.)

Later medical records show that in March 2004 the plaintiff developed symptoms of Bell's palsy, including *inter alia* tongue and lip swelling, left facial swelling and an inability to close fully his left eyelid. (R.131-136.) This problem was treated pharmacologically, and the plaintiff was advised at that time by Dr. Miller that he could continue his job operating heavy equipment. (R.135.) The plaintiff subsequently experienced reoccurrences of these symptoms in October 2004, April 2005 and again in June 2005. (R.131,163-167,194-195.) On each occasion the symptoms abated with medication. (R.131,163, 194-195.)

Based upon a January 2005 review of the plaintiff's then-available treatment records and relying explicitly on Dr. Miller's opinion eight months earlier, a state agency consultant concluded that the plaintiff retained the ability to function at a medium exertional level and remained able to perform his prior job as a heavy equipment operator. (R.157-162.)

Complaining of persistent low back pain for a couple of months with episodic radiation of the pain into his lower extremities, the plaintiff was seen by Dr. Hatter on March 5, 2005. (194-195.) Based on his clinical assessment, a diagnosis of "lumbar arthritis" was made, and Dr. Hatter prescribed Tylenol and low back mobilization exercises. (R.194.) A lumbosacral spine study two days later demonstrated significant degenerative osteoarthric changes in the lumbar spine. (R.196.)

6

When seen later in the year, on August 13, 2005, for an agency-arranged medical examination, Dr. Douglas Murphy found the plaintiff to have decreased range of motion in the dorsolumbar area of the spine. (R.171,174-175.) Similarly, he found restricted range of motion in the plaintiff's neck and bilaterally in his shoulders, hips and knees. (R.171-172,174-175.) He also found bilateral evidence of a lower extremity radiculopathy. (R.172.) And in addition, this consultive examiner noted that the plaintiff exhibited a mild tremor bilaterally and some gait, station, and reflex abnormalities. (R.172,174.) Nothing in the record contradicts any of these findings by the consultive examiner.

X-rays of the lumbosacral spine taken in connection with Dr. Murphy's examination demonstrated "diffuse degenerative disc and . . . joint disease." (R.173.) X-rays of the plaintiff's right knee similarly demonstrated "moderately severe degenerative joint disease in the medial and patellofemoral joint compartments." (*Id.*)

Based on these radiographic studies, his clinical finding, and the medical history, Dr. Murphy concluded that the plaintiff had "moderately severe osteoarthritis" with attendant limitations in cervical, dorsolumbar, hip and knee flexion. (R.172,175.) In a nutshell, as Dr. Murphy said in his written assessment. "[the plaintiff's] limitations are of the nature that physical work would not be advisable for this gentleman." (R.172.)

After noting that the plaintiff's arthritis had not been previously considered, on August 23, 2005 a second state agency medical consultant outlined the consultive examination results, noted that

7

the plaintiff's limitations were consistent with Dr. Murphy's findings, and concluded that the plaintiff was functionally limited to light work activity. (R.176-182.)

## IV. Analysis

At step-two of the agency's decisional process the ALJ found as a fact that the plaintiff had three "severe" medical problems: degenerative disc disease of the back, degenerative joint disease in both knees and arthritis. (R.16.) Nevertheless, he gave "no weight" to Dr. Murphy's clinical findings, to the results of the relevant radiographic studies, or to the related functional assessment made by the second state agency consultant. (R.19.) By doing so, the plaintiff argues in his brief, the ALJ improperly rejected the clinical findings and conclusions of the agency's examining physician and relied instead on an earlier state agency functional assessment which never considered the plaintiff's significantly advanced osteoarthritis.

As justification for giving "no weight" to Dr. Murphy's arthritis-related findings and opinions and equally none to the second state agency consultant's functional assessment, the ALJ advanced four reasons. (R.16-20.) He cited Dr. Murphy's opinion concerning the ultimate ability-to-work issue as a basis to reject the evidence. As a second reason, the ALJ described the examination as an assessment "primarily based on the [plaintiff's] self-reported limitations." Third, he dismissed it as being only a "one time" examination, and as a fourth justification he noted the absence of any arthritis-related complaints to a health care provider before March 2005. (R.19.)

8

On review, none of these constitutes a substantial basis in fact upon which to predicate a finding that the plaintiff retained the functional ability to perform his past relevant work and to deny his applications for benefits.

As a general principle, the ALJ is correct in saying that the ultimate determination of an individual's disability under the Act is reserved to the Commissioner and that a physician's opinion on that issue is not entitled to special significance. 20 C.F.R. §§ 404.1527(e) and 416.927(e). The medical opinions of an examining physician, however, are generally entitled to be given significant decisional weight, because they "reflect judgments about the nature and severity of [a plaintiff's] impairments, including . . . symptoms, diagnosis and prognosis, what [he or she] can still do despite impairments and [the individual's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) and 404.1527(d)(1); 20 C.F.R. §§ 416 927(a)(2) and 416,927(d)(1). In the instant case, Dr. Murphy's findings represented far more than a mere conclusory statement of disability. They reflect, by any measure, serious medical judgments about the nature and severity of plaintiff's condition and were entitled to significant decisional consideration.

Dr. Murphy, in this case, clearly expressed decisionally cognizable medical opinions. He described the plaintiff's symptoms; he set forth his clinical findings; he noted the radiographic findings, and he assessed the plaintiff's osteoarthritis to be "chronic" and "moderately severe." (R.171-172.) He provided a general description of the plaintiff's limitations "due to problems sitting, standing, walking, lifting, carrying, reaching, handling, crawling, creeping, bending, [and] stooping." (R.172.) And he expressed his medical opinion regarding the plaintiff's ability to work

9

on a regular and sustained basis. While there may well be a cognizable reason to reject this final conclusion by Dr. Murphy, it is not a legitimate reason to reject *in toto* the medical findings and opinions of this examining physician.

The ALJ's rejection of Dr. Murphy's examination results on the grounds that they were primarily based on the plaintiff's statements is equally without merit. By doing so, the ALJ ignored completely both the results of Dr. Murphy's objective musculoskeletal findings and the X-ray studies which more than justified, individually or in combination, Dr. Murphy's conclusion that the plaintiff had significant degenerative lumbar disc and degenerative bilateral knee joint disease. (R.171-175.)

Similarly, the ALJ's rejection of Dr. Murphy's findings and conclusions because they were based on a single examination is misplaced. As defined in the agency's regulations, Dr. Murphy was a *"nontreating source, "* that is: "a physician . . . who has examined [the plaintiff] but . . . did not have an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. §§ 404.1502 and 416.902. When the agency arranged the consultive examination in this case, it did so in order to obtain "additional evidence" it deemed necessary to make an informed disability conclusion. *See* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3). Under the regulations, the frequency of examination may be taken into account in the determination of an individual's residual functional capacity, but is not a legitimate basis upon which to predicate a total disregard of the results of a consultive examination arranged by the agency pursuant to its own regulations. *See Owens v. Barnhart*, 400 F. Supp. 2$^d$ 885, 894 (W.D.Va. 2005); *see generally* 20 C.F.R. §§ 1527(d)(2)(I) and 416.927(d)(2)(I).

10

The ALJ's reliance on the absence of a longitudinal treatment record for osteoarthritis is also unpersuasive. Degenerative joint and disc disease, as osteoarthritis is commonly called, [5] begins gradually and generally progresses slowly over many years. [6] In the case now before the court, the attendant joint space narrowing and bony overgrowths characteristic of this condition were irrefutably demonstrated by the radiographic studies done as part of Dr. Murphy's examination. Likewise, the degree to which the disc and joint degradation had progressed was evident from these studies. Thus, both the current and long-term existence of the degenerative disease process cannot be factually contested. At most, the medical record suggests only that the plaintiff's osteoarthritis had been more or less asymptomatic before Winter of 2005-2006 and, for whatever reason, became active and painful at that time.

Although in many instances this nearly universal disease process remains essentially asymptomatic into old age, the onset of joint pain and difficulties along with mobility and joint

---

[5] "Degenerative disc disease is not a medical term of art. Instead, it is a 'convenient label …applied carelessly to a variety of distinct [degenerative] processes of spinal joints.' Donald Resnick M. D., *Diagnosis of Bone & Joint Disorders* 1372 (3d ed. 1995). Degenerative diseases of the spinal joints commonly result from structural changes 'in the vertebral bone and endplate, which occur with advancing age, [and] interfere with normal discal nutrition.' *Id.* at 1373. One common degenerative disease of the spine is intervertebral chondrosis, which occurs when 'aging results in dehydration and loss of tissue resiliency in the inter-vertebral disc.' *Id.* at 1375. Although the cause of intervertebral chondrosis is 'not defined[,] … the opinion that long-standing stress is important in its development has gained wide acceptance.' *Id.* 'Congenital factors may also be important.' *Id.* Another disease often described by the catch-all phrase 'degenerative disc disease' is spondylosis deformans, which is typified by bone outgrowths, called osteophytes, along the vertebral column. *Id.* at 1386. Spondylosis deformans is 'extremely common' with 'precipitously rising frequency …with advancing age.' *Id.* at 1386. It is 'generally …accepted' that spondylosis deformans is caused by repeated exposure to stress at the site of 'abnormalities in the peripheral fibers' of the spinal column. *Id.* at 1388. Finally, the term 'degenerative disc disease' is used to denote several varieties of osteoarthritis of the spine. *Id.* at 1396-1400. Osteoarthritis of the spinal joints is 'similar to degenerative diseases of other synovial joints.' *Id.* at 1396. Osteoarthritis is 'a noninflammatory degenerative joint disease …characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.' *Dorland's Illustrated Medical Dictionary* 1199 (28th ed. 1994). " *McCoy v. Holland,* 364 F.3d 166, 167, n.3 (4th Cir.2004).

[6] *See* preceding footnote.

11

flexibility difficulties can occur for a number of reasons. [7] And in about seven percent of all men over the age of sixty years it is the cause of disability. *See e.g.*, D.T. Felson *et als, The Prevalence of Knee Osteoarthritis in the Elderly*, 30 Arthritis Rheum 914-918 (Aug. 1987); J. Buckwalter, *et als, The Impact of Osteoarthritis: Implications for Research*, Clinical Orthop. Relat Res, 2004 Oct (427 Supp):S6-15; *See generally Robinson v. United States*, 330 F. Supp. 2$^d$ 261, 285 (W.D.N.Y. 2004); *Lucio v. Barnhart*, 2004 U.S. Dist. LEXIS 12207, *5 (N.D.Ill. 2004)

In short, as of March 2005 the medical record establishes that the plaintiff had medical impairment resulting from this anatomical abnormality; it had been demonstrated by acceptable diagnostic techniques, and it could be reasonably expected to produce the pain and restrictions in joint and spinal motion identified by Dr. Murphy during the course of his consultive examination. *See* 20 C.F.R. §§ 404.1529 and 416.929; *Jenkins v. Sullivan*, 906 F. 2$^d$ 107, 109 (4th Cir. 1990) (once objective medical evidence establishes a condition which could reasonably be expected to cause pain, an individual's allegations of pain may not be discredited simply because they are not confirmed by objective evidence of its severity).

As the plaintiff correctly argues, the consulting examiner's opinions are consistent with the nature of his objectively diagnosed degenerative orthopaedic conditions. The ALJ's discussion of

---

[7] The factors associated with the development of symptomatic osteoarthritis include increased age, genetic factors, exposure to stress, obesity, having another form of arthritis, and pathophysiologic factors. *See e.g., Osteoarthritis*, American College of Rheumatology (April 11, 2002); J. Dequeker *et als, Osteoarthritis and Osteoporosis: Clinical and Research Evidence of Inverse Relationship*, 1 Aging Clin Exp Res 426-39 (Oct. 2003); S. Messier *et als, Exercise and Dietary Weight Loss in Overweight and Obese Older Adults with Knee Osteoarthritis*, 50 Arthritis & Rheumatism 1501-1510 (May 2004); Y. Miyamoto, *et als, Common Variants in DVWA on Chromosome 3p24.3 Associated with Susceptibility to Knee Osteoarthritis*, 40 Nature Genetics 994-998 (Aug. 2008). *See also McCoy v. Holland*, 364 F.3$^d$ 166, 167, n.3 (4th Cir.2004).

12

the evidence is at odds with this record, and his rejection of osteoarthritis as a decisionally significant condition is neither medically nor decisionally supportable. Therefore, the Commissioner's final decision should be reversed and the case remanded solely for the purpose of calculating and paying benefits consistent with this report and recommendation.

## V.     Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.     The Commissioner's final decision is not supported by substantial evidence;

2.     The Commissioner's final decision failed to give proper consideration and weight to the consultive examination findings and opinions of Dr. Murphy;

3.     The Commissioner's final decision failed to give proper consideration to the plaintiff's osteoarthritis and its associated functional limitations;

4.     Substantial medical and activities evidence does not exist in the record to support the Commissioner's findings concerning the plaintiff's symptoms and residual functional limitations;

5.     Substantial evidence does not exist to support the Commissioner's finding that through the decision date the plaintiff was not disabled within the meaning of the Act;

6.     Substantial evidence does not exist to support the Commissioner's finding that through the decision date the plaintiff retained the residual function capacity to perform either any of his past relevant work or to perform other work activity on a regular and sustained basis at a medium level of exertion;

7.     Given the plaintiff's age, education and a maximum sustained work capacity limited to light work as a result of severe medically determinable impairments, the plaintiff

13

is disabled by application of Medical-Vocational Guidelines (20 C.F.R.,Part 404, Subpart P, Appx. 2, Rule 202.02) since March 2005;

8.    The final decision of the Commissioner should be reversed and the case remanded solely for the purpose of calculating and paying benefits; and

9.    Plaintiff's counsel should be granted an extension of time pursuant to Rule 54(d)(2)(B) within which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days subsequent to the receipt of a notice of award of benefits from the agency; provided, however, any such extension of time **would not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.**

## VI.    Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that the Commissioner's summary judgment motion be DENIED, the decision denying benefits be REVERSED, the plaintiff's summary judgment motion be GRANTED, and the case REMANDED solely for the purpose of calculating and paying benefits in a manner consistent with this Report and Recommendation.

The clerk is directed to transmit the record in this case immediately to the presiding district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## VII.    Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within

Case 5:07-cv-00091-SGW-JGW   Document 14   Filed 10/09/08   Page 14 of 15   Pageid#: 75

ten (10) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: 9th day of October 2008.

_/s/_  *James G. Welsh*
United States Magistrate Judge